#21-cv-05347-VB

# State of New York
# Court of Appeals

The People &c.,
        Respondent,
    v.
Sanjay Tripathy,
        Appellant.

     I, Heather Davis, Deputy Clerk of the New York State Court of Appeals, do hereby certify that the attached copies of (1) a letter dated January 26, 2021 from Arnold J. Levine, Esq., attorney for Sanjay Tripathy; (2) a letter dated February 8, 2021 from Luis Morales, Esq., for the People of the State of New York; and (3) a letter dated April 29, 2021 from Arnold J. Levine, Esq., attorney for Sanjay Tripathy are true and correct copies of the original letters submitted in the above captioned matter.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of this Court this first day of July, 2021.

Heather Davis
Deputy Clerk of the Court

A-5

(144)

RECEIVED

MAY 0 4 2021

NEW YORK STATE
COURT OF APPEALS

# ARNOLD J. LEVINE
## ATTORNEY-AT-LAW

# 230 JAY STREET, #7E
# BROOKLYN, NY 11201
Telephone: (917) 951-9626
E-mail: Awn915@gmail.com

April 29, 2021

Honorable Leslie E. Stein
Associate Judge
New York Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, N.Y. 12207

**Re:**     **People v. Sanjay Tripathy**
**New York County Ind. # 2720-2016**

Dear Judge Stein:

This letter is in support of Mr. Tripathy's previously filed motion for reconsideration of his leave application. By letter dated April 20, 2021, I was advised by the Clerk of the Court that any additional submissions must be mailed to Your Honor within ten days of that letter, or April 30, 2021.

By Order dated March 24, 2021, Your Honor denied without explanation Mr. Tripathy's application for leave to appeal to the Court of Appeals from the affirmance by the Appellate Division, First Department, of Mr. Tripathy's conviction in Supreme Court, New York County, of the crimes of Criminal Sexual Act in the First Degree, Sexual Abuse in the First Degree, Assault in the Second Degree, and related misdemeanors. In his leave application, Mr. Tripathy requested Your Honor grant leave to appeal on every issue raised in his opening and reply briefs filed in the First Department, but presented two of those issues in detail as particularly leaveworthy.

The first issue raised concerned a compelling Brady issue, the interpretation and application of New York's Rape Shield Law, and the interplay between Brady and the rape shield. The second issue presented as particularly worthy of this Court's review was the correct interpretation and application of the preservation rule embodied in CPL §470.05(2), which is applied inconsistently between and within the various Departments of the Appellate Division. While we respectfully request reconsideration of all the issues raised in the leave application, this letter address in ore detail why Your Honor should reconsider granting leave to appeal on the Brady/Rape-Shield issue.

A -5

145

## Brady and the Rape Shield Law

The primary issue for the jury's consideration was whether the sex between Mr. Tripathy and the complainant in Mr. Tripathy's hotel room was consensual. Mr. Tripathy and the complainant had met through a website called SeekingArrangements.com, which catered to "sugar babies" seeking "sugar daddies." While Mr. Tripathy testified that they went to his hotel room for the purpose of engaging in consensual sex for which he paid the complainant a total of $1,500, including compensation for time spent at dinner and then having drinks at the hotel bar, she testified that they never discussed sex or compensation on their "date," that she went to his room to receive a "gift," and that she received no money from Mr. Tripathy for the 'date" or for sex. But the complainant went beyond a mere denial; instead, she manufactured lies to support her claims. Worse yet, the prosecutor and the trial court knew her testimony to be false and refused to provide the defense with the information that would have revealed her lies to the jury. By sitting idly by while their main witness perjured herself time and again, the prosecutors endorsed and shielded the lies. The trial court did no better, openly backing the complainant's claim that she could not remember whether she had ever asked any other men for money for a "date." The trial judge would not allow the defense to ask the complainant whether she had asked other men on the site for money for sex, even though the court was well aware that Mr. Tripathy was claiming that the complainant prostituted herself on the site and even though the complainant's own words in her messages with other men make clear that she asked men for money for both dates and sex.

Of particular concern regarding Your Honor's denial of the leave application is that Your Honor apparently never viewed the messages at issue. The undersigned is unaware of any communication between Your Honor and the prosecutor requesting that he send the messages, which are under seal, to you for review. Nor is there anything in the prosecutor's response to the leave application indicating that he had included the messages with his response or was intending to send them separately. Notably, the trial court never reviewed the messages at issue before ruling *in limine* that they were protected by the rape shield law. Moreover, the First Department's reasoning leaves one with the distinct impression that that court either did not read the trial testimony or did not read the messages. Notably, the Appellate Division, after inexplicably finding no Brady violation, stated in passing that the messages "implicated" the rape shield law, but engaged in no analysis and made no finding that none of the rape shield law's exceptions applied. Indeed, even if the complainant's messages with other men "implicated" the rape-shield law, their disclosure to the defense and use on cross-examination, or even introduction in evidence, were not barred by the rape-shield law for at least two reasons. First, disclosure was constitutionally required under Brady and its progeny because they were favorable and material to the defense. Second, the messages contained reliable evidence that the complainant was prostituting herself, just as Mr. Tripathy claimed, in the exact time span and under the exact circumstances present in this case.

### *The messages constituted Brady material*

Had Your Honor reviewed the messages at issue and compared them to the complainant's testimony in the Appendix provided, the complainant's perjury and the materiality of the messages

A-5

(146)

would have been unmistakable. There are at least five ways in which those messages, if disclosed to the defense, would have been used not only to discipline the complainant on cross-examination, see People v. McCray, 23 N.Y.3d 193, 199-200 (2014), but to eviscerate her credibility. First, the complainant, aided by the prosecution, presented much evidence, through the complainant and her friend Joe Palmer, for the purpose of demonstrating that the complainant was financially secure and financially independent, if not wealthy, and, therefore, not a woman who would prostitute herself. There were numerous messages among those hidden from the defense, however, that would have proved that, at least at the time of her encounter with Mr. Tripathy, she was in need of "financial help," that she did not have a successful business at that time, that she was seeking men who would pay her a minimum of $10,000 per month, that she told men that they would "have to" give her $1,000 for a "date," and that she refused to meet with at least eight men who could not meet her fee demands. And that was just in the five-day period between the date she and Mr. Tripathy first exchanged messages and the date of the incident in Mr. Tripathy's hotel room. That is, the prosecutor made a calculated effort to exploit the court's decision to hide the messages from the defense by misleading the jury regarding the complainant's financial condition and her mission to get paid by men she met on the SeekingArrangements site. These messages were favorable to the defense and would have cast the complainant in an entirely different financial light than that presented to the jury.

Second, the complainant told the jury that although she asked Mr. Tripathy for compensation in her first communication with him, the subject never came up again, there was no agreement, and she received no money. In fact, in an effort to persuade the jury that she never raised the issue of compensation again and that she received no money from Mr. Tripathy, she concocted a story about a "coffee challenge" that she was just "willing to try." She claimed that she inquired about compensation in her first message with Mr. Tripathy almost as a test. That is, she explained (falsely) that she asked hoping that Mr. Tripathy would agree to pay her, but if he did not, it did not matter, that being paid was not a condition precedent to "dating" or having sex with a man she met on the site. In fact, the messages prove, in her own words, that compensation was required; that she would refuse to meet absent an agreement on compensation. For example, she messaged with one man who offered to compensate her in the amount of $1,500 per week to meet three times per week. The complainant told him that $1,500 for three meetings per week was "too low." She countered that he would "have to" pay her $1950 per week, or $650 per meet. She assured him that she would make it "totally worth it." She also told that man that she could host for 3-4 hours fo $900. After that man told her that he can not pay her $900, she responded not by agreeing to meet anyway, but by telling him that she used to get $10,000 per month and wished him "good luck." Notably, those negotiations took place without her even seeing a picture of him (she told him that if she hosts, she will need a picture of him).

Similarly, she told another man that she needs financial help and wants a monthly allowance. When that man offered her $700 for their first "date," she countered that it "would have to be $1,000." Likewise, after asking a third man how much money for monthly or per meet, that man responded with an offer of $300 per meet for "dinner, drinks, activities, night together" at his place. She told him that it "would have to be $1,000." Yet a fifth man who she asked for money, was told

A -5

that his offer of $5,000 per month was "too low" for her. She did not agree to meet anyway; rather, she wished him luck rather than meet him anyway. A sixth man proposed $500 per meet. She responded with "too low for me" and wished him luck. She engaged in unsuccessful negotiations with a seventh man. She told that man unequivocally that he would have to pay her $1,500 to go to his hotel room "for sex." He countered with an offer of $1,000, to which she responded with $1,200. When he asked whether she would consider accepting $1,000 for their encounter, she replied with an emphatic "No," demonstrating her refusal to meet with him for less than $1,200. When an eighth man told her that $10,000 per month was too much for him, she told him "good luck" instead of meeting with him anyway. When a ninth man proposed paying her $2,500 per month, she told him that she required $1,000 per meeting. In addition, she told the jury that she did not think that she discussed compensation with Kevin, who was supposed to see after leaving Mr. Tripathy the night of the incident. But in his first message to her, Kevin offered her $10,000-$15,000 per month. It is unfathomable that that slipped her mind. Rather, she exploited the trial court's *in limine* ruling and treated it as a license to lie. And the prosecutors and the court apparently were fine with that.

Importantly, these messages proving that she refused to meet with men who could not or would not meet her fee requirements were exchanged during the same five-day period encompassing her entire interaction with Mr. Tripathy, from the initial message on the site to the incident in Mr. Tripathy's hotel room. These messages prove that, despite her claims under oath at trial, her request for payment from Mr. Tripathy was not part of some nonsense "coffee-shop challenge" that she was just "willing to try," but was the opening salvo in her fee negotiations with Mr. Tripathy and that compensation was a requirement. These messages proved that she was lying to the jury when she testified that her request for money was neither serious nor consequential.

But despite this treasure trove of devastating impeachment material, prosecutors and the court sat on their hands and let her commit perjury. Moreover, these messages, including the amounts she consistently said she would "have to" receive corroborated Mr. Tripathy's testimony that they did, in fact, have a fee agreement and that he, in fact, paid her the cash he was seen on video withdrawing from the ATM twice during their "date."

Third, the complainant volunteered to the jury twice that she was a woman of "high integrity." By withholding the complainant's messages from the defense, the court deprived the defense of the opportunity to challenge this self serving character evidence. Certainly, the jury should have been free to consider the dozens of messages from the same five-day period at issue in the case in which she repeatedly requested money for dates and sex. She consistently coupled her requests for money with assurances that she was "very naughty in bed," loved oral and anal sex, was turned on by drinking the man's juices, and would do anything to make them happy. Given her characterization of herself as a woman of "high integrity," and therefore not a woman who would engage in the prostitution or sexual acts described by Mr. Tripathy, those messages were favorable to Mr. Tripathy and should have been provided to him for the purpose of challenging her self-serving assessment of her integrity.

Fourth, the complainant claimed on cross-examination not to remember whether she had

4

asked any other men on SeekingArrangements.com for money. This claim is laughable to anybody who had seen the messages, including the prosecutors. In fact, during just the five-day span covering June 11, 2016 (the date she and Mr. Tripathy first exchanged messages), and June 15, 2016 (the date of the incident), she exchanged messages with approximately 26 other men. Of those 26, she asked at least 17 of them how much money they would pay her either monthly or on a per-meet basis or otherwise discussed specifics about financial compensation. And she told three others that she was seeking a "generous" guy. Thus, the defense was denied the opportunity to conduct a blistering cross-examination that would have proved the complainant to be a liar. To be sure, those messages prove indisputably that her claim that she could not remember whether she had asked anybody else for money was a lie, not an honest failure of memory. Indeed, as she told virtually every man with whom she communicated on the site, her purpose for being on the site was to find somebody to pay her a minimum of $10,000 per month, in return for which she would do "anything" and "everything" to please them. Yet the trial court endorsed this charade by interrupting cross-examination not to provide these messages to the defense, but to allow the prosecutors to meet with their lying witness privately to "refresh her recollection." To make matters worse, the trial court told defense counsel that if the complainant continued her charade, defense counsel would be stuck with her obviously false answers. So when the complainant returned to the stand and claimed that her memory was refreshed that she had asked some other men for money, the defense and, more importantly, the jury was denied the information that proved she was lying. In fact, she still left the jury with the incorrect impression that she had simply 'tried" the "coffee-shop challenge" with some other men, misleading the jury regarding the nature and extent of her fee requirements. Because the messages that were hidden from the defense clearly contradicted her trial testimony on a material issue, they undoubtedly were favorable to the defense and were constitutionally required to be disclosed to the defense.

Fifth, in an effort to convince the jury that she would not have consented to engage in the sex acts described by Mr. Tripathy, the complainant told the trial jury that she was sexually conservative, was not experienced with domination and submission, and liked only bland sex. However, in just the four days between first communicating with Mr. Tripathy and her encounter with him in his hotel room, she told at least two men on the SeekingArrangements site that she was experienced at, and enjoyed, being submissive and dominated. In addition, she repeatedly assured the more than two dozen men with whom she communicated during those five days that she would do anything to make them happy, that she loved anal sex, and that she was turned on by drinking a man's fluids. Those messages clearly called into serious question her claims of being inexperienced in, and not knowledgeable about, domination and submission, and her claims of being sexually conservative and interested only in bland sex. Those messages, therefore, were clearly favorable to the defense and, consequently, should have been provided to the defense.

The messages were also favorable to the defense in that they affirmatively supported and corroborated Mr. Tripathy's testimony of his encounter with the complainant. Mr. Tripathy testified that he paid the complainant a total of $1,500, for dinner, drinks, and sex in his hotel room. He also testified that they had a mutual interest in rough sex, including dominant-submissive sexual encounters, and anal sex. The complainant's messages with other men were clearly favorable to the defense, in that they were remarkably consistent with Mr. Tripathy's testimony, despite the fact that

A -5

149

the content of the messages was never disclosed to the defense.

For example, the complainant's messages proved that the complainant was charging men she met on the site for sex with her. Indeed, as noted earlier, in almost every message, she coupled her demand for money with an assurance that she is "very naughty in bed," "sexual," willing to do anything to please her man, loved anal sex, was turned on by drinking a man's fluids, and that it would be totally worth it. Notably, Mr. Tripathy testified to receiving the same assurance that it would be worth it after he questioned why the complainant was not the same woman depicted in the pictures on her profile page. Moreover, Mr. Tripathy testified that he paid the complainant a total of $1,500, which included dinner, drinks, and then sex in his hotel room. Lo and behold, the suppressed messages show that on June 14, 2016, the day before she met up with Mr. Tripathy, the complainant told another suitor, in her own words, that ""if we have a connection and go upstairs for sex it will be $1500." Also on June 14, 2016, she told another man that he would have to pay her $1,500 for 3-4 hours and "it would include sex if we have a connection." Not coincidentally, $1,500 is the same amount Mr. Tripathy claimed to have paid her. Of course, Mr. Tripathy testified to that without knowing that she quoted two other men the exact same amount for the same thing the day before his "date" with her. Those messages, therefore, were favorable to the defense, in that they demonstrate that, consistent with Mr. Tripathy's version of events, the complainant was at that time charging men $1,500 for 3-4 hours of time and that it included sex. Also, the complainant had to admit in the face of all the video surveillance of them kissing and groping each other, that she and Mr. Tripathy "had a connection," as she no doubt did with all the men she met on the site who showed up with the money for her services.

It is also clear from the suppressed messages that the sex was not really contingent on their being a true "connection," as oppose to a manufactured one for transactional purposes. Even aside from the two messages quoted above in which she explicitly states that her $1500 fee includes sex, there were several others in which, when quoting a price, she inquired whether the man had in mind, dinner and fun, drinks and fun, or just fun. What's clear is that "fun" was understood to be the common denominator and included in whatever she quoted, the variation in fees resulting from whether the man wished to have dinner and/or drinks first, which would mean more time and, therefore, more money.

All of her dozens of messages with other men over the course of her five-day interaction with Mr. Tripathy were also favorable to the defense because they supported Mr. Tripathy's testimony about the complainant's attempt to extort him, in two ways. First, they reveal that she was looking for a "deep pocket," somebody out of whom she could gets tens, if not hundreds, of thousands of dollars. Extorting a married business man who she believed was worth $10 million would accomplish that goal. Second, they also supported Mr. Tripathy's testimony that she demanded extra money because the redness and marks caused by the rough consensual sex would prevent her from seeing Kevin, who promised her a big payday, that same night, and would keep her from going on other paid "dates" for days. That is, the messages corroborate Mr. Tripathy's testimony that she demanded he make up for the money she would not be making in the ensuing days and that she threatened to reveal their tryst to his family and employer if he did not. These messages demonstrate

6

A - 5

150

her need for money and that she was prostituting herself for anywhere from $650-$1500 per "date." Thus, they provide the motive for the extortion claimed by Mr. Tripathy.

Also, on June 11, 2016, the same day as her first communication with Mr. Tripathy, the complainant told a suitor that she had a submissive side. Similarly, on June 15, 2016, the same day as her encounter with Mr. Tripathy, the complainant told another man on the site that she "would be interested" in an encounter with the man, who described himself as "a very experienced SD and dominant." She also told him that she is submissive and very naughty in bed. These messages were favorable to the defense, in that they supported Mr. Tripathy's testimony that she told him she was submissive and enjoyed rough sex.

The messages with other men proved conclusively that the complainant's explanation for asking Mr. Tripathy for money, and her claims that the issue was never addressed again, that they did not agree on her fee, that she did not receive money from Mr. Tripathy, that she did not go to his hotel room for sex in exchange for $1500, and that they did not have consensual sex were lies. The prosecutor and trial court knew they were lies, but they not only did nothing to correct them. Instead, they protected and endorsed them.

Addressing such blatant <u>Brady</u> violations, correcting a miscarriage of justice based on the complainant's obvious and repeated perjury, and condemning the trial court's and prosecutors' failure to correct the perjured testimony are all matters of statewide concern. This court needs to make clear to judges and prosecutors that the rape shield law is not to be used as a license to present and protect perjured testimony, and that exploitation of a favorable rape-shield ruling will open the door to introduction of the otherwise precluded evidence.

### *The suppressed messages were reliable evidence that the complainant was engaging in prostitution activity at the relevant time.*

In enacting the rape shield law, the sate legislature recognized that a complainant's engagement in prostitution is relevant to a consent defense. Thus, CPL 60.42 expressly provides for the admissibility in evidence of proof that the complainant had been convicted of prostitution within *three years* preceding the sex offense at issue at trial. The evidence of the complainant's prostitution activity at the time of her encounter with Mr. Tripathy, however, is far more probative than a three-year old conviction. In this case, the evidence was the complainant's own words assuring men that the $1500 she demanded as payment included sex. This is far more reliable evidence of actual prostitution activity than a certificate of conviction. Also, because those messages were sent the day before her meeting with Mr. Tripathy, they are far more probative than a conviction obtained three years prior. In addition, while the circumstances leading to a three-year old conviction may bear little resemblance to the circumstances presented at trial, in this case, the circumstances were identical and therefore highly probative.

A -5

(151)

<u>There is a reasonable possibility of a different outcome had the messages been disclosed to the defense.</u>

Despite the People's claims to the contrary, this was a classic case of he said, she said. There were no other people present in Mr. Tripathy's hotel room when the sex occurred. And despite misleading and disingenuous arguments by the People in the First Department and in their response to Mr. Tripathy's leave application, the other evidence, including, but not limited to, the forensic evidence, medical evidence, video evidence, bank records, and ear-witness testimony from the woman whose hotel room adjoined Mr. Tripathy's room all favored Mr. Tripathy's testimony that the complainant engaged in consensual sex with him in exchange for an agreed upon fee and that he assaulted the complainant after the consensual sex when she tried to extort him for more money. (See Reply Brief at 1-12.) In fact, it took the jury several days of deliberations to reached its verdict and only after sending several notes requesting red-back. Thus, the evidence against Mr. Tripathy was far from overwhelming. There is a reasonable possibility, therefore, that had the nonprivileged, nonconfidential messages been provided to defense counsel, they would have proved that the complainant lied repeatedly to the trial jury about material issues and would have corroborated and supported Mr. Tripathy's version of their encounter. Accordingly, there is a reasonable possibility that there would have been a different result had the numerous messages favorable to Mr. Tripathy been disclosed to him.

Mr. Tripathy, therefore, respectfully, requests that Your Honor reconsider his application for leave to appeal, that Your Honor review the briefs and Appendix previously submitted, and that Your Honor review the nonprivileged, nonconfidential messages at issue.

Respectfully,

Arnold J. Levine
*Attorney for Sanjay Tripathy*

c: A.D.A. Luis Morales by email

8

A-5



Amended Complaint

Case # 21-cv - 05349 - V.B
[Tripathy v. Peuz et. al.]
SDNY.

**Exhibit (B)**

153

## STANDARD OF REVIEW [AMENDED COMPLAINT]

1. RLUIPA [Religious Land Use and Institutionalized Persons Act of 2000]:
Rule: No Government shall impose a substantial burden on the religious
exercise of a person residing in or confined to an institution...even
if the burden results from a rule of general applicability, unless the
government demonstrates that imposition of the burden on that person -
(1) is in furtherance of a compelling governmental interest; and (2) is
the least restrictive means of furthering that compelling governmental
interest.

42 USC §2000cc-1(a): This act shall be construed in favor of a broad
protection of religious exercise, to the maximum extent permitted by the
terms of this Act and the Constitution.

Definitions:

Religious Exercise: The term includes any exercise of religion, whether
or not compelled by, or central to, a system of religious belief.

Rules of Construction: Claims to Funding unaffected...but this chapter may
require a government to incur expenses in its own operations to avoid
imposing a substantial burden on religious exercise.

Cases References:

US Supreme Court

Tanzin v. Tanvir (2020); Ramirez v. Collier (2022);

Sossamon v. Texas (2011); Gonzales v. OCentro Espirita Beneficente (2006);

Holt v. Hobbs (2015)

Cutter v. Wilkinson (2005)

Thomas v. Review Board (1981)

Hernandez v. Commissioner of Internal Revenue (1989)

Mast v. Fillmore County, Minnesota (2021)

Fulton v. City of Philadelphia, Pennsylvania (2021)

Tandon v. Newsom (2021)

US Circuit Courts of Appeal

Williams v. Annucci (2018), 2nd Circuit

Washington v. Gonyea (2013), 2nd Circuit

Tanvir v. Tanzin (2018), 2nd Circuit

Jova v. Smith (2009), 2nd Circuit

Robinson v. Superintendent Houtzdale SCI (2017), 3rd Circuit

Adkins v. Kaspar (2004), 5th Circuit

Bryd v. Haas (2021), 6th Circuit

Ackerman v. Washington (2021), 6th Circuit



Ex - B B



(154)

Haight v. Thompson (2014), 6th Circuit

RLUIPA requires Strict Scrutiny Analysis: as Fulton explains strict scrutiny requires a precise individual analysis, thus Courts cannot rely on broadly formulated governmental interests but must scrutinize the asserted harm of granting specific exemptions to particular religious claimants. If the government can achieve its interests in a manner that does not burden religion its must do so. In Tandom v. Newsom the Court says - "The State cannot assume the worst when people go to worship but assume the best when people go to work. In Mast v. Fillmore County, Minnesota - J Alito, said the lower court plainly misinterpreted and missapplied RLUIPA. In RLUIPA under the strict scrutiny standard, the government bears the burden of proving both that its regulation serve a compelling governmental interest and that its regulations are narrowly tailored.

Sincerely held Religious Beliefs: see Thomas v. Review Board where the Court said "It is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the command of their common faith. Courts are not arbiters of scriptural interpretation." See Hernandez v. Commissioner of Internal Revenue where the Court said - "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or validity of litigants interpretation of those creeds."

Substantial Burden: Courts have interpreted "substantial burden" to mean that the government action/regulation/activity at issue for the program either - (1) puts great pressure on petitioner to change his behavior that violate his core and sincerely held religious beliefs; and (2) prevents him to engage his in his religious actions that more than just inconveniences him by putting pressure on him. Per 146 Cong. Rec. S7776 [daily ed. July 2000; Joint Statement of Sen. Hatch and Sen. Kennedy] stating that the term "substantial burden" is to be interpreted by Supreme Court [US] jurisprudence. In Jova v. Smith (2009), 2nd Circuit and Adkins v. Kaspar (2004), 5th Circuit the Courts say "We recognize that our test requires a case-by-case, fact specific inquiry to determine whether the governmental action or regulation in question imposes a substantial burden on an adherents religious exercise; however we perceive





this kind of inquiry to be unavoidable under RLUIPA and the circumstances it addresses. That is why we make no effort to craft a bright-line rule."

The Burden Shifting Framework of RLUIPA: Where the petitioner adduces evidence sufficient to shaow that the governmental practice substantially burdens his religious exercise, the onus shifts to the government to demonstrate that the practice furthers a compelling governmental interest, and the burden imposed on religion is the least restrictive means of achieving that interest. See Holt v. Hobbs (2015) and Williams v. Annucci (2018), 2nd Circuit, Robinson v. Superintendent Houtzdale SCI (2017), 3rd Circuit, Ackerman v. Washington (2021), 6th Circuit, Bryd v. Haas (2021), 6th Circuit. Further see O Centro Espirita, 546 US at 436, 126 S.Ct. 1211 - "The Government's argument echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you. I'll have to make one for everybody, so no exceptions." See Holt, 574 US at 367, 135 S.Ct. 853 - "The Department has not adequately demonstrated why its grooming policy is substantially underinclusive."

Monetery Damages under RLUIPA: See Tanzin v. Tanvir (2020) and Tanvir v. Tanzin (2018), 2nd Circuit both RFRA [a sister statute to RLUIPA with similar language and protections] where the Courts ruled that federal government employees are liable for monetory damages [under the term of "appropriate relief"] in their individual capacity. In Sossamon v. Texas (2011) the Court ruled out monetoryy damages [for RLUIPA] for state government employees, but only in their official capacity under sovereign immunity protections [which does not apply under individual capacity]. Both the 2nd Circuit in Washington v. Gonyea (2013) and the 6th Circuit in Haight v. Thompson (2014) in RLUIPA cases opined [under spending clause] that damages were unavailable in individual capacity but did not rule [under commerce clause] it out comprehensively under the doctrine of constitutional avoidance. In light of the Tanzin RFRA rulings it may be time for a comprehensive ruling by the District and Circuit Courts for RLUIPA [both under the spending and commerce clause].

Ramirez v. Collier [US Supreme Court, 2022; 2022 WL 867311; March 24th, 2022]: In this crucial RLUIPA case the Court said - "the government cannot discharge its burden... by pointing to broadly formulated interests, it must instead demonstrate that the compelling interest test is satisfied through application of the challenged law [regulation] to the partcular claimant..." J Kavnaugh, concurring said - ...the compelling interest and least restrictive means standards require this Court to make difficult judgments about the strength of the State's interests and whether those interests can be satisfied in other ways that are less restrictive of religious exercise. J Roberts said - resolu-tion of RLUIPA claims in the prisoner context requires a case-specific consideration of the partcular circumstances and claims. Ⓔ Ⓢ

BX-13

2. Preliminary Injunction [FRCP Rule 65]:

See Alabama Association of Realtors v. Department of HHS (US Supreme Court, 2021) where the Court held that associations had substantial likelihood of success of merits quoting Nken v. Holder,  556 US 418, 434; 129 S.Ct. 1749, (US Supreme Court, 2009) listing the four traditional stay factors (1) if stay applicant is likely to succeed on the merits; (2) whether the applican will be irreparably injured absent a stay; (3) whether the stay will injure substantially the other parties interest; and (4) where the public interest lies;

A preliminary injunction is an extraordinary remedy, one that should only be granted if movant by a clear showing, carries the burden of persuasion; Capstone Logistics Holdings Inc. v. Navarrete, (2018), 2nd Circuit.

A party seeking a preliminary injunction must demonstrate - (1) likelihood of success on the merits to make them a fair ground for litigation and a balance of harships tipping decidedly in plaintiff's favor; (2) a likelihoo of irreparable injury in the absence of an injunction; (3) that the balance of hardships tipping in plaintiff's favor; and (4) that public interest would not be disserved by the issuance of an injunction; see Benihana Inc. v. Benihana of Tokyo, LLC, (2015), 2nd Circuit.

Ex - B




3. First Amendment - Free Exercise Clause

See <u>Brandon v. Kinter</u>, 938 F.3d 21 (2nd Circuit, Sep 10, 2019); <u>Redd v. Wright</u>, 597 F.3d 532,536 (2nd Circuit, 2010) quoting <u>O'Lone v. Estate of Shabazz</u>,482 US 342,349 (US Supreme Court, 1987) in making a determination a determination in a prison setting must consider the four-factor test from <u>Turner v. Safely</u>, 482 US 78,90-91 (US Supreme Court, 1987) and <u>Cutter v. Wilkinson</u>, 544 US 709,717 (US Supreme Court, 2005); 4 factors include (1) rational connection between legitimate government interests; (2) is there an alternative means of obtaining similar religious benefits; (3) impact on prison guards, inmates and resources in accomodating the religious requests; and (4) alternate and viable options available to meet the religious needs. The law under the Free Exercise Clause of the First Amendment is less generous to plaintiffs than under RLUIPA and a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy "is reasoanbly related to legitimate penological interests."

Also see <u>Fulton v. City of Philadelphia, Pennsylvania</u> (US Supreme Court, 2021) --as Fulton explains strict scrutiny reqquires [in this First Amend-ment Free Exercise Case] a precise individual analysis, thus Courts cannot rely on broadly formulated governmental interests but must scrutinize the asserted harm of granting specific exemptions to particular religious claimants. If the government can achieve its interests in a manner that does not burden religion it must do so.





(158)

4. First Amendment - Establishment Clause

The three prong analysis articulated by the US Supreme Court in Lemon v. Kurtzman [403 US 602], 1971 to assess Establishment Clause challenges. Under Lemon, government action that interacts with religion must: (1) have a secular purpose; (2) have a principal effect that neither advances nor inhibits religion, and (3) not bring about an excessive government with religion.

5. Fourteenth Amendment - Equal Protection Clause; Intermediate Scrutiny;

To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable or suspect classs See Giano v. Senkowski, 54 F.3d 1050, 1057 (2nd Circuit, 1995);suspect/protected class of a constitutional right [religion] using intermediate scrutiny

6. Qualified Immunity

See Brandon v. Kinter, 938 F.3d 21 (2nd Circuit, Sep 10, 2019) where the Court said - Defendant entitled to qualified immunity if (1) the Defendant(s conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known; and (2) it was objectively reasonable for [the Defendant] to believe that his actions were lawful at the time of the challenged act quoting "Cerrone v. Brown" 246 F.3d 194, 199 (2nd Circuit, 2001).

7. RICO [Racketeer Influenced and Corrupt Organizations Act; 18 USC 881961-1968]

RICO claims must allege each of these claim elements (1) conduct; (2) of the enterprise; (3) a pattern; and (4) of racketeering activity as well as injury to business or property as a result of RICO violation; see Chevron v. Donziger, 833 F.3d 74 (2nd Circuit, Aug 8, 2016) and First Nationwide Bank v. Gulf Trading Corp., 27 F.3d 763,767 (2nd Circuit, 1994) where the Court said - In order to bring suit under RICO Plaintiff must state (1) defendant(s) violation; (2) injury to property/business; (3) causation of injury due to defendant(s) violations.

8. False Claims ACt [FCA] 31 USCA 83729]:

For FCA a person acts "knowingly" when he has actual knowledge of informa- -tion, acts in deliberate ignorance of truth or falsity of information, or acts in reckless disregard of truth or falsity of information. See US v. Strock, 982 F.3d 51 (2nd Circuit, Dec 3, 2020) where - FCA imposes liability on a person who either "knowingly" presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or ~~fraudulent~~ fraudulent claim.





(159)

31 USC §3729(a)(1)(A)-(B); "Knowingly" means that a person (1) has actual knowledge of the information (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information under §3729(b)(1)(A).

9. 14th Amendment - Due Process: See <u>Cunney v. Board of Trustees of Village of Grandview, NY</u>; 660 F.3d 612, 2nd Circuit, 2011; Substantive due process protects against government action that is arbitrary, conscious-shocking or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised.

10. 5th Amendment - Due Process; See <u>Bryant v. New York State Educ. Dept</u>, 2nd Circuit, 2012; Procedural Due Process Claim is composed of 2 elements; (1) the existance of property/liberty interest that was deprived; (2) the deprivation of that interest was without due process;

Ex-0 B



<u>Amended Complaint</u>

Case #21-cv-05349-VB
[Tripathy v. Peuz et. al.]
SDNY

**Exhibit (C)**



STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

FORM 2131E (REV. 6/06)
**INMATE GRIEVANCE COMPLAINT**

*DISCRIMINATION GRIEVANCE*
*(1st Amendment, RLUIPA)*

| | Grievance No. |
|---|---|
| | FCF - 0079 - 21 |

_FISHKILL C.F._   CORRECTIONAL FACILITY

Date _3/24/2021_

Name _TRIPATHY, SANJAY_   Dept.No._18R1673_ Housing Unit _MB-11/2-10_

Program _School/IPA_ AM _Unassigned_ PM
_Law Library Clerk - EVENING_

*(Please Print or Type - This form must be filed within 21 calendar days of Grievance Incident)\**

Description of Problem: (Please make as brief as possible) Grievant is required to complete the
SOCTP program which requires him to admit to his crimes
(he is innocent and the process is under appeal), against his con-
and sincerely held religious beliefs guaranteed under the 1st Amendment
and RLUIPA. These laws state - State/Doccs are prohibited to
substantially burden Grievant's religious rights, thus the grievance.
I have written to, and discussed the matter with SORC Reid/
S.W. Feuz, on 3/24/2021, Copy-Legal file; Attorney; SDNY US District
Grievant                                        Court of NY
Signature _Sanjay (SANJAY TRIPATHY)_

Grievance Clerk _____   Date: _____

Advisor Requested ☐ YES ☐ NO   Who: _____

Action requested by inmate: ① Written Guarantee by DOCCS that I will not be
forced to lie in the SOCTP Program, and negatively impacted for
SORA/SOMTA, against my case and sincerely held religious beliefs
guaranteed under the constitution/laws. ② Zero retaliation/harassment
This Grievance has been informally resolved as follows: /intimidation/loss of benefits by DOCCS

_____

_____

_____

This Informal Resolution is accepted:
(To be completed only if resolved prior to hearing)

Grievant
Signature _____   Date: _____

If unresolved, you are entitled to a hearing by the Inmate Grievance Resolution Committee (IGRC).   C-1

*An exception to the time limit may be requested under Directive #4040, section 701.6(g).

(162)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

## FISHKILL CORRECTIONAL FACILITY

### GRIEVANCE RECEIPT NOTIFICATION

**TO:** _Timothy, t. 16R 1673_
_(NAME / DIN #)_

**FROM:** Grievance Office

**DATE FILED:** _3-29-21_

This is to inform you that the below referenced grievance has been received by the Grievance Office and filed on the date noted above.

**GRIEVANCE #** _0079-21_

**CODE** _6_

**TITLE** _Admit (minus)/ SOCTP_

Notes
- recd via mail on 3/29/2021
  at 5PM in Dorm 11-2/10
- This was filed/mailed out on 3/24/21
  but the date received by IGRC is 3/29/21

C-1

(163)

FORM 2131E (REVERSE) (9/12)

**Response of IGRC:**  FCF-0079-21                    4-7-2021

Grievance Unfavorable.  Per ADSP "G," the requirement is "still correct."
I.G.R.C. notes, per C.O.R.C. SHG-29772-15, grievant's concerns are a requirement
to be performed.

Date Returned to Inmate: 4-7-2021        IGRC Members: Sg. A.

Chairperson: E. Mullens

Return within 7 calendar days and check appropriate boxes.*

☑ I disagree with IGRC response and wish to
appeal to Superintendent.

☐ I agree with the IGRC response and wish to
appeal to the Superintendent.

☐ I have reviewed deadlocked responses.
Pass-Thru to Superintendent.

☐ I apply to the IGP Supervisor for
review of dismissal.

Signed: _____ SANJAY TRIPATHY  4/8/2021
              Grievant                    Date

_____  Grievance Clerk's Receipt  _____  Date

***To be completed by Grievance Clerk.***

Grievance Appealed to the Superintendent: _____
                                          Date

Grievance forwarded to the Superintendent for action: _____
                                                      Date

C-1

(164)

* An exception to the time limit may be requested under Directive #4040, section 701.6(g).

Appeal to Superintendent Edward Burnett, Fishkill CF (FCF-0079-21)

## INMATE GRIEVANCE COMPLAINT (SUPERINTENDENT APPEAL)
### Fishkill Correctional Facility (DOOCS, New York State)
Subject: Appeal to Superintendent, Fishkill CF (Grievance # FCF-0079-21)

**Grievance No: #FCF-0079-21**          **Date: Thursday, April 08th, 2021**

**Name: Sanjay Tripathy;          DIN#18R1673;   Housing Unit: MB-11/2-10**

**Appeal to Superintendent (Grievant Statement):** The grievant has been wrongly denied by the IGRC without addressing the specifics of his concern which still exist - I am a life-long practicing Hindu (Religion – Hinduism) and one of my core and sincerely held religious beliefs is not to lie (speak, discuss or admit to lies or untrue facts either spoken, written or a combination) but a key requirement of the SOCTP program is to admit guilt, but as you can clearly see if I admit guilt by lying (as I am 100% innocent and did not commit any of the charged crimes) as part of the program, I will be in serious violation of my core and sincerely held religious beliefs, which is a substantial burden on me to get benefits from a DOCCS (New York State) run program thus violating my constitutional rights under the 1st amendment and RLUIPA. RLUIPA clearly forbids the Government (and an entity like DOCCS) to put a substantial burden on my core and seriously held religious beliefs, which will modify my behavior to comply with the requirements of the SOCTP program. These options gives me no choice. In essence my 2 options are the following – #1 - take the program and successfully complete it by lying; #2 follow my core and sincerely held religious beliefs (by speaking the truth and not admitting guilt, which will be a 100% lie), but get a loss of good time, by not following the program requirements) and being thrown out, and going home late and other negative consequences. If the Grievance process does not provide any relief, then Grievant wants to be complaint with the PLRA (per Hayes v. Dahike October 5th, 2020 – 2nd Circuit Court of Appeals).

**Action Requested by Inmate:** I would like the following written from DOCCS *guarantee* for the SOCTP program - Inmate "Sanjay Tripathy" will not be compelled to lie or provide any untrue facts as part of his SOCTP program and admit guilt (if it is a lie) based on his core and sincerely held religious beliefs, which are protected and guaranteed under the 1st Amendment and RLUIPA. As a result of the above, Inmate "Sanjay Tripathy" will not be removed/delayed or otherwise negatively affected from the SOCTP program for any administrative, arbitrary and capricious reasons, which in turn may affect the finalization of good time credit for him (his earliest release date is 5/15/2024).DOCCS will ensure it will not negatively impact his earliest release date due to his participation based on the above 2 points in the SOCTP program, and will not make any negative recommendations or decisions that may affect his SORA and SOMTA requirements (for sex offender registration or civil confinement recommendations) and its impact on Inmate "Sanjay Tripathy".

**Respectfully Submitted,**
*[signature]*
**Sanjay Tripathy (18R1673)**
*An Innocent man wrongly incarcerated by New York State*

---

**Sanjay Tripathy; 18R1673, Fishkill CF, Box #1245, Beacon, NY 12508-1245**

C-1

(165)

| NEW YORK STATE **Corrections and Community Supervision** | GRIEVANCE NO. FCF #0079-21 | DATE FILED March 29, 2021 |
|---|---|---|
| | FACILITY FISHKILL CORRECTIONAL FACILITY | POLICY DESIGNATION Institutional |
| **INMATE GRIEVANCE PROGRAM** | TITLE OF GRIEVANCE Admit Crimes - SOCTP | CLASS CODE 06 |
| **SUPERINTENDENT** | SUPERINTENDENT'S SIGNATURE *W.Burnett* | DATE April 15, 2021 |
| GRIEVANT TRIPATHY, S. | DIN #18R1673 | HOUSING UNIT MB-11-210 |

Grievant's action requested is granted with clarification.

Grievant is advised that an investigation has been conducted by the Office of the Deputy Superintendent for Programs.  It was revealed that, in accordance with CORC decision SHG 29772-15, in part: "Grievant is required to openly and honestly discuss the behavior that resulted in his incarceration and referral to the SOCTP, demonstrate acceptance of responsibility for the conduct that resulted in his criminal conviction and demonstrate an understanding of the sexual offending behavior and cycle of abuse.  He is not required to admit the commission of any specific Penal Law offense, nor describe his offending behavior in a manner consistent with a specific Penal Law definition."


vlr


xc:  DSP Wood (w/case file)

---

**APPEAL STATEMENT**

If you wish to refer the above decision of the Superintendent please sign below and return this copy to your Inmate Grievance Clerk.  You have seven (7) calendar days from receipt of this notice to file your appeal.*  Please state why you are appealing this decision to C.O.R.C.  (Per RLUIPA)  Copy- Legal file ; SDNY Appeal to CORC - My Grievance is still not resolved as the questions remain - Will I be forced to lie despite my core and sincerely held religious beliefs is still unresolved.   4/18/2021

GRIEVANT'S SIGNATURE  *SANJAY TRIPATHY*                DATE

---

GRIEVANCE CLERK'S SIGNATURE                                    DATE

* An exception to the time limit may be requested under Directive #4040, section 701.6(g).

FORM 2133 (02/15)                                        C-1              166

Appeal to CORC, DOCCS, Albany (Grievance #FCF-0079-21)

## INMATE GRIEVANCE COMPLAINT (APPEAL to CORC)
### Fishkill Correctional Facility (DOOCS, New York State)
Subject: Appeal to ~~Superintendent~~, Fishkill CF (Grievance # FCF-0079-21)

*CORC*

Grievance No: **#FCF-0079-21**        Date: **Friday, April 16th, 2021**

Name: **Sanjay Tripathy;**        DIN#**18R1673**;   Housing Unit: **MB-11/2-10**

**Appeal to CORC (Grievant Statement):** The grievant has been wrongly denied by the IGRC and Superintendent, without addressing the specifics of his concern which still exist - I am a life-long practicing Hindu (Religion – Hinduism) and one of my core and sincerely held religious beliefs is not to lie (speak, discuss or admit to lies or untrue facts either spoken, written or a combination), but a key requirement of the SOCTP program is to admit guilt, but as you can clearly see if I admit guilt by lying (as I am 100% innocent and did not commit any of the charged crimes) as part of the program, I will be in serious violation of my core and sincerely held religious beliefs, which is a substantial burden on me to get benefits from a DOCCS (New York State) run program thus violating my constitutional rights under the 1st amendment and RLUIPA clearly forbids the Government (and an entity like DOCCS) to put a substantial burden on my core and seriously held religious beliefs, which will modify my behavior to comply with the requirements of the SOCTP program. These options gives me no choice. In essence my 2 options are the following – #1 - take the program and successfully complete it by lying; #2 follow my core and sincerely held religious beliefs (by speaking the truth and not admitting guilt, which will be a 100% lie), but get a loss of good time, by not following the program requirements) and being thrown out, and going home late and other negative consequence. If the Grievance process does not provide any relief, then Grievant wants to be complaint with the PLRA (per Hayes v. Dahlke October 5th, 2020 – 2nd Circuit Court of Appeals).

**Action Requested by Inmate:** I would like the following written guarantee from DOCCS for the SOCTP program – Inmate "Sanjay Tripathy" will not be compelled to lie or provide any untrue facts as part of his SOCTP program and admit guilt (if it is a lie) based on his core and sincerely held religious beliefs, which are protected and guaranteed under the 1st Amendment and RLUIPA. As a result, Inmate "Sanjay Tripathy" will not be removed/delayed or otherwise negatively affected from the SOCTP program for any administrative, arbitrary, capricious reasons, which in turn may affect the finalization of good time credit for him (his earliest release date is 3/15/2024). DOCCS will ensure it will not negatively impact his earliest release date due to his participation based on the above in the SOCTP program, and will not make any negative recommendations or decisions that may affect his SORA and SOMTA requirements (for sex offender registration or civil confinement recommendations), its impact on Inmate "Sanjay Tripathy".

Respectfully Submitted,

_____

**Sanjay Tripathy (18R1673)**
*An Innocent man wrongly Incarcerated by New York State*

---

**Sanjay Tripathy; 18R1673, Fishkill CF, Box #1245, Beacon, NY 12508-1245**

C-1

(167)



 **NEW YORK STATE** | **Corrections and Community Supervision**

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

## MEMORANDUM

From:   Shelley Mallozzi, Director, Inmate Grievance Program

SUBJ:   Receipt of Appeal

Date:   5/5/2021

S TRIPATHY  18R1673
Fishkill Correctional Facility
Your grievance FCF-0759-21 entitled
SOCTP Program Requirements/Admit Crimes
was rec'd by CORC on 4/28/2021

**A disposition will be sent to you after the grievance is reviewed by CORC**

C-1

168



| | Grievance Number | Desig./Code | Date Filed |
|---|---|---|---|
| **NEW YORK STATE** **Corrections and Community Supervision** | FCF-0079-21 | I/6 | 03/29/21 |
| | Associated Cases | | Hearing Date |
| | | | 05/27/21 |
| ANDREW M. CUOMO Governor    ANTHONY J. ANNUCCI Acting Commissioner | Facility Fishkill Correctional Facility | | |
| INMATE GRIEVANCE PROGRAM CENTRAL OFFICE REVIEW COMMITTEE | Title of Grievance Admit Crimes/SOCTP Requirements | | |

## GRIEVANT'S REQUEST UNANIMOUSLY ACCEPTED IN PART

Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby accepted in part only to the extent that CORC upholds the determination of the Superintendent for the reasons stated.

CORC asserts that participation in the SOCTP does not require an incarcerated individual to admit to the commission of a particular crime. Rather, participants are required to <u>accept responsibility</u> for the offending behavior that resulted in their criminal conviction, focusing on their thoughts and feelings at the time of the offense. Participants can discuss the behavior in general terms without providing the full names of victims, without disclosing the exact dates, times, and places of various sexual offending behavior, and without admitting to the violation of specific sections of the Penal Law. CORC notes that SOCTP staff follow these guidelines and <u>require participants to meet the criteria.</u>

CORC notes that the grievance program is not intended to support an adversary process and that no reprisals of any kind shall be taken against an incarcerated individual or employee for good faith utilization of this grievance procedure. An incarcerated individual may pursue a complaint that a reprisal occurred through the grievance mechanism.

With respect to the grievant's appeal, CORC has not been presented with sufficient evidence of malfeasance by staff and advises him to address future similar concerns to his assigned ORC.

HLK/

--------------------------------------------------------------------------

--------------------------------------------------------------------------

*NOTE:*
*received*
*on 7/13/2021 at 5.25 pm*
*at Fishkill C.F.*
*Via Internal Mail.*
*Ruy 7/13/2021*

This document has been electronically signed by Shelley M. Mallozzi

C-1

(169)

FORM 2131E (9/12)      STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
# INMATE GRIEVANCE COMPLAINT

Discrimination/Arbitrary Capricious & Unconstitutional
Acts with intent for harm; Misrepresentation & Fraudulent
Use of Taxpayer Funds

Grievance No.
COL - 0010 - 22

_____ COLLINS _____ CORRECTIONAL FACILITY

Date: 12/23/2021

Name: SANJAY TRIPATHY      Dept. No.: 18R1673  Housing Unit: D1/40

Program: Unassigned   AM   SOCTP        PM

**(Please Print or Type – This form must be filed within 21 calendar days of Grievance Incident)\***

Description of Problem: (Please make as brief as possible)  Petitioner has a Static99R assessment score of 1 which (per SOCTP Program Manual) should entail a low risk (upto 6 months) SOCTP Program. But due an override (Attachment 4 of the SOCTP manual) has been assigned a moderate risk (9-12 months) SOCTP Program. Petitioner has written (to Dr. Ryan Brotz;Psychologist Collins SOCTP and Brian McCallister multiple ocassions) asking for (along with FOIL requests) for Memos/Guidelines/Policies & Procedures (showing scientific and industry standard criteria, metrics) which have been ignored,and no scientific analysis has been provided to ascertain that this override is petitioner's best interest and responsible use of taxpayer funds. Petitioner has also pointed out wrong information (used in the override from the PSI report on the basis of Court documents/records) and to date has no response/explanation to this discretionary and self serving action of putting him into the moderate risk SOCTP program. Cc: Legal File/HON. Vincent L. Briccetti, US District Judge, SDNY (Case#21-cv-05349-VB; Tripathy v. Feuz et.al

Grievant
Signature: Sanjay Tripathy

Grievance Clerk: _____     Date: _____

Advisor Requested ☐ YES  ☐ NO   Who: _____

Action requested by inmate: Immediate determination of formally assigning Petitioner to only the low risk SOCTP program (upto 6 months).

The Grievance has been formally resolved as follows:

This Informal Resolution is accepted:
(To be completed only if resolved prior to hearing)

Grievant
Signature: _____     Date: _____

If unresolved, you are entitled to a hearing by the Inmate Grievance Resolution Committee (IGRC). C-2
\* An exception to the time limit may be requested under Directive #4040, section 701.6(g).



FORM 2131E (REVERSE) (9/12)

**Response of IGRC:** COL-0010-22

Grievant informed IGRC cannot change their program level. We recommend grievant continue to have positive Programming.

Date Returned to Inmate: 1/27/22          IGRC Members: _____

Chairperson: _____

Return within 7 calendar days and check appropriate boxes.*

[X] I disagree with IGRC response and wish to appeal to Superintendent.

[ ] I have reviewed deadlocked responses. Pass-Thru to Superintendent.

[ ] I agree with the IGRC response and wish to appeal to the Superintendent.

[ ] I apply to the IGP Supervisor for review of dismissal.

**Appeal to Superintendent (1/27/2022) - L. Latona, Collins CF (Key Questions)**

#1. Does Grievants Static99R score [1] per DOCCS SOCTP Manual put him in the low-risk program [SOCTP] - Yes/100%; #2. Did Dr. Brotz put an overide to moderate-risk [approved by DSP SCXhneider & Brian Mcallister] - Yes; #3. Is there any DOCCS/New York State approved criteria [documented/signed/dated] made avaible/   Signed: _____ 1/27/2022
                                                                    Date
even via FOIL - No; #4. Does DOCCS want additional federal/State/Taxpayer funding [if Grievant is put in Moderate instead of Low] - Yes; #5 Did Dr. Brot: rely on wrong information [from Grievant's PSI] even when Court records were given [to her by Grievants' Attorney] and did she correct the determination -No; Thus no criteria [scientific that is approved, signed or available], reliance on wrong info, and self-srving interest with misuse of federal funds; Must reverse decision.
Cc: legal/SDNY

_____          _____
Grievance Clerk's Receipt                      Date

*To be completed by Grievance Clerk.*

Grievance Appealed to the Superintendent: _____
                                              Date

Grievance forwarded to the Superintendent for action: _____
                                                          Date

C-2    (171)

* An exception to the time limit may be requested under Directive #4040, section 701.6(g).

| NEW YORK STATE **Corrections and Community Supervision** | GRIEVANCE NO. COL-0010-22 | DATE FILED 01/11/2022 |
|---|---|---|
| | FACILITY COLLINS | POLICY DESIGNATION INSTITUTIONAL |
| **INCARCERATED GRIEVANCE PROGRAM** | TITLE OF GRIEVANCE LOW-RISK SOCTP | CASE CODE 06 |
| **SUPERINTENDENT RESPONSE** | SUPERINTENDENT'S SIGNATURE | DATE 02/04/2022 |
| GRIEVANT SANJAY TRIPATHY | DIN 18R1673 | HOUSING UNIT D1-40 |

The grievant submitted a complaint regarding their placement in moderate-risk SOCTP instead of low-risk that generated per their Static99R score.  Investigation found the Grievant's score on the Static99R recommended a placement in the low-risk group, but the Psychologist submitted an override to Central Office that took into account all relative factors and their professional opinion.  The override was reviewed and granted by Central Office staff, and the grievant was subsequently placed in moderate-risk SOCTP.  I find the Grievant's placement appropriate.

Grievance is denied.

---

APPEAL TO CORC (2/4/2022)          APPEAL STATEMENT

If you wish to appeal the above decision of the Superintendent, please sign below and return this copy to the IGRC at the facility where the grievance was filed. You have seven (7) calendar days from receipt of this notice to file your appeal.* Please provide a reason why you are appealing this decision to CORC. Grievant is appealing the denial [IGRC/ Superintendent] to CORC [final step in Grievance process] as the SOCTP Override is wrong [without any approved/signed/or scientific criteria and wrongsfacts proven wrong with Courtrecords/provided to Dr. R. Brotz] to the moderate-risk [instead of low-risk based on Static99R score of 1] and needs to be reversed. This overide action is arbitrary, capricious, an abuse of discretion, and

misuse of taxpayer funds. Must reverse immediately by CORC.

_Sanjay Tripathy 2/4/22_ Sanjay Tripathy; Cc:Legal File          2/4/2022
          GRIEVANT'S SIGNATURE                                                                 DATE

          GRIEVANCE CLERK'S SIGNATURE                                                          DATE

*An exception to the time limit may be requested under Directive #4040, section 701.6 (g)

Form 2133 (12/21)

C-2

(172)



**NEW YORK STATE** | **Corrections and Community Supervision**

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

**MEMORANDUM**

From:       Rachael Seguin, Acting Director, Incarcerated Grievance Program

SUBJ:       Receipt of Appeal

Date:       3/24/2022

S TRIPATHY  18R1673
Collins Correctional Facility
Your grievance COL-0010-22 entitled
Assign To Low Risk SOCTP
was rec'd by CORC on 3/2/2022

**A disposition will be sent to you after the grievance is reviewed by CORC**

C-2

173